**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**PITTSBURGH**

| | | |
|---|---|---|
| JANET ANDREWS, | ) | |
| | ) | |
| Plaintiff, | ) | 2:24-CV-01016-MJH |
| | ) | |
| vs. | ) | |
| | ) | |
| HEARING INSTRUMENTS, INC., | ) | |
| | ) | |
| Defendant, | ) | |

**<u>OPINION</u>**

On July 15, 2024, Plaintiff, Janet Andrews, filed a Complaint against Defendant, Hearing Instruments, Inc. (ECF No. 1). On March 3, 2025, Plaintiff filed a six-count Amended Complaint, alleging claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963. (ECF No. 28). On August 5, 2025, Defendant filed a Motion for Summary Judgment, accompanying brief, and Concise Statement of Material Facts. (ECF Nos. 36-38). On September 6, 2026, Plaintiff filed her response, accompanying brief, and Counter Statement of Material Facts. (ECF Nos. 42-45). On September 19, 2025, Defendant filed its Reply. (ECF No. 47). All of the issues are briefed and ripe for disposition. For the reasons below, Defendant's Motion for Summary Judgment will be granted in full.

## I.    Statement of Facts

Plaintiff, Janet Andrews, worked for Defendant, Hearing Instruments, Inc. as a part-time Front Office Assistant ("FOA") at Defendant's location in Butler, Pa ("the Butler Office") from

1

October 15, 2021, until June 19, 2023, when she was terminated. (ECF No. 46, at 1). Ms. Andrews reported directly to Gary Grant, the Regional Manager. (*Id.* at 2). Mr. Grant did not have any authority to discipline or terminate employees. (*Id*). That authority was exclusive to Julie McKelvey, Defendant's CEO. (*Id.*).

In May of 2023, as a result of an office remodel, new filing cabinets were installed at the Butler Office. Ms. Andrews testified that, on May 2, 2023, she told Mr. Grant that the filing cabinets would not fit all the files that they had at the Butler Office. (ECF No, 37-1, at 77-79). Ms. Andrews further testified that, on May 2, 2023, Mr. Grant called the corporate office and ordered more filing cabinets, and that Mr. Grant informed Ms. Andrews of the same. (*Id.*).

Throughout her employment at the Butler Office, Ms. Andrews did not get along with two other employees, Marleen Hoffmann, the on-site Hearing Instruments Specialist, and Margie Wolfe, Patient Care Specialist. (*Id.* at 3-5). On May 18, 2023, Ms. Hoffmann sent an email to Mr. Grant, reporting issues that she had been having with Ms. Andrews in the workplace. (*Id.* at 8); (ECF No. 37-11). On May 19, 2023, Ms. Wolfe also emailed Mr. Grant, reporting the issues that she had with Ms. Andrews. (*Id.*); (ECF No. 37-10). Mr. Grant forwarded both of the emails to Vino Nau, an employee in the Human Resources and payroll department. (*Id.*). At that time, Ms. McKelvey was on vacation and would not be returning until the end of the month. (*Id.*). Ms. Nau testified that, based on the emails from Ms. Hoffman and Ms. Wolfe, she drafted a proposed written warning for delivery to Ms. Andrews once Ms. McKelvey reviewed and approved it upon her return. (*Id.* at 9).

On May 26, 2023, Mr. Grant sent an email to himself with the subject line: "things to discuss with Janet on Tuesday." (*Id.* at 9-10); (ECF No. 37-13). Mr. Gary's email contained a summary

of Ms. Hoffmann's and Ms. Wolfe's complaints about Ms. Andrews. (ECF No. 37-13). Mr.

Grant sent his email to Ms. McKelvey at 7:54 a.m. on May 30, 2023. (ECF No. 46, at 9-10). On

May 30, 2023, at 7:59 a.m., Ms. Andrews emailed Ms. Nau, informing her that Ms. Andrews'

hand specialist diagnosed her with Dupuytren Contracture, that it was due to the repetitive tasks

she performed at the Butler Office, and that Ms. Andrews intended to file a workers'

compensation claim. (ECF No. 37-16). On May 30, 2023, at 11:22 a.m., Ms. McKelvey emailed

Ms. Andrews a written warning related to her workplace behavior. (ECF No. 37-14). The written

warning listed the various complaints that had been made about Ms. Andrews, and it specifically

indicated that she was "not consistently having Patients complete the front of the Audiogram

prior to the appt." (*Id.*). On the same day, at 12:06 p.m., Ms. Andrews responded to Ms.

McKelvey's email, explaining her side of the situation. (ECF No. 37-15).

On May 31, 2023, at 6:22 p.m., Ms. Hoffmann emailed Ms. McKelvey, communicating that

Ms. Andrews had not had a prospective client immediately fill out or complete a required

audiogram form when they arrived at the Butler Office. (ECF No. 46, at 15). The email detailed

that, after Ms. Hoffmann told Ms. Andrews to have the prospective client fill out the audiogram

form, Ms. Andrews had the patient then complete the form. (*Id.*). At 9:17 p.m. on the same day,

Ms. McKelvey emailed Ms. Andrews a second written warning stating:

> After just sending the warning yesterday, today again you violated the policy. A
> competitive user came in and you never had them fill out the required front of the
> Audiogram. You only had them complete the HIPAA form and then took the form
> into Marleen. She had to again tell you to have the Patient complete the required
> front of the Audiogram so that we had all the Patient information prior to the
> appointment.
>
> I'm not sure where the confusion is on this. This policy is critical to our business
> operations (especially with a competitive user) and you continue to ignore it.

(ECF No. 37-19).

On June 1, 2023, Ms. Andrews responded with her own email, explaining what had happened, and that she had asked Ms. Hoffmann a question about the forms that needed to be filed for the prospective client, and after receiving Ms. Hoffmann's response, Ms. Andrews did have the prospective client fill out the proper forms. (ECF No. 37-20). Within Ms. Andrews' email, she also noted the "hostility [she] ha[s] to deal with." (*Id.*). In the same email, Ms. Andrews also wrote, "I apologize for not following protocol, I am not perfect, but at least I asked and took care of it." (*Id.*). In another June 1, 2023 email to Ms. McKelvey, Ms. Andrews wrote, "this duress today is too much. I have a diagnosis of high blood pressure and right now I am so light headed and emotionally upset that I am not in the right mind set to handle my responsibilities today." (ECF No. 46, at 18-19); (ECF No. 37-21). Ms. Andrews left work early that day. (ECF No. 46, at 18-19). Ms. Andrew's returned to work on June 5, 2023, and she worked until June 13, 2023, with no further incident. (*Id.* at 20). On June 13, 2023, Ms. Andrew's emailed Denise Simpson, who worked in the human resources department, indicating that she had suffered a back injury at work on that day. The email stated as follows:

> Hi Denise,
>
> Unfortunately I need to let you know of a lower back injury that occurred this morning.
>
> These file cabinets that hold files right to left and sit floor level instead of front to back are not very ergonomically safe. They sit low and considering I have to sit sideways while bending or squatting to get to a file has been challenging to say the least.

(ECF No. 37-23). After sending this email, Ms. Andrews left work. (ECF No. 46, at 21-22). On June 14, 2023, Ms. Andrews provided Defendant with a disability certificate from her chiropractor that said she was unable to return to work until "further notice."

(*Id.* at 22). Ms. Wolfe covered Ms. Andrews' FOA position during her absence. Ms. Wolfe testified that, on June 15, 2023, she was looking for Defendant's landlord's contact information, which she believed was in a binder that was kept in a certain room at the Butler office. (ECF No. 37-7). When she could not find it, she emailed Mr. Grant, Ms. McKelvey, and Ms. Hoffman, stating:

> There was a black binder here that had information handed down from Lori and Roseanne that had a bunch of info in it such as policies, some passwords, info like the landlord and just general knowledge about the office. It is not here. It was always in the Lace Room. I looked through the FOA desk. Marleen does not have it. It is nowhere to be found.

(ECF No. 37-26). On June 16, 2023, Ms. McKelvey emailed Ms. Andrews the following:

> Hi Janet, I hope you are feeling better. The attachments sent do not give any idea of when you can come back to work. Can you please let me know what they told you or any general timeframe on how long you'll be out? Also, when your next follow up appt is with the Chiropractor.
>
> And while you are out, please just correspond with me on the status of coming back. In addition, you do not need to call the Corporate office each day to let them know you will be out. Just communicate directly with me via email and that will suffice.
>
> Lastly, We are missing a binder in the office and I'm hoping you know where it is. It's a black binder that had that had [sic] a bunch of info in it such as policies, some passwords, landlord info and just general knowledge about the office. It was always in the Lace Room, and we cannot locate it. If you have any idea where it is can you let me know?

(ECF No. 37-27). On June 18, 2023, Ms. Andrew's responded, indicating that she did have the binder, her email, as relates to the binder, was as follows:

> As far as the binder. First of all it was my personal binder and while the list of contents you were told were in it is only hearsay, it confirms my suspicion that my personal belongings were tampered with the days prior. It clearly said on the outside, JANET ANDREWS Personal Notes (big and bold). While I have never snooped through Margie or Marleens personal stuff I'm not surprised. Anyway, there wasn't any Landlord info or policies. My passwords were shredded because I wasn't sure how long I'd be out and was already suspicious the info was tampered

5

with so I figured when I got back I could request a password reset if I couldn't remember it. I do realize that while it was my binder, its contents are property of Hearing Instruments so you can be assured there is nothing I want, need or care to have in my possession.

Please know that I am not tied to email so I will do my best to stay in touch.

(*Id.*). On June 19, 2023, Ms. McKelvey emailed Mr. Grant, Ms. Hoffmann, and Ms. Wolfe, asking about the contents of the binder. Ms. Wolfe emailed Ms. McKelvey on the same day in response, indicating that she believed the binder contained patient notes, general information about the administration of the office, and passwords. (ECF No. 37-28). On the same day, after receiving this information from Ms. Wolfe, Ms. McKelvey sent Ms. Andrews a termination notice stating,

On Tuesday 6/13/23 you left the office and took confidential company information with you. This information also included confidential Patient information. This is a violation of both your employment agreement and the HIPAA agreement, both of which you signed. Company and/or patient information is never to leave the office.

This is the 3rd and final warning which has resulted in employment termination effective immediately.

(ECF No. 37-29).

## II.    Standard of Law

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted). Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.* In reviewing and evaluating the evidence to rule upon a

6

motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted). However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law. *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.  Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

## III.    Discussion

Ms. Andrews brings discrimination, retaliation, and failure to accommodate claims under the ADA and PHRA. The ADA prohibits discrimination against a qualified individual "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. § 12112(a). The PHRA similarly bars adverse action based on disability, and both statutes are analyzed under the same standard. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 (3d Cir. 2010); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). Absent any direct evidence, disparate treatment and retaliation claims under the ADA abide by the *McDonnell Douglas* burden-shifting framework. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156 (3d Cir. 2017). First, a plaintiff must establish a prima facie case for discrimination or retaliation. *Id.* If a plaintiff can establish a prima facie case, the burden shifts to the defendant to provide a legitimate nondiscriminatory reason for their actions. *Id.* If the defendant provides a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to show that the proffered reasons are pretextual. *Id.*

### A.  Counts I and IV: Disability Discrimination Claims

Ms. Andrews brings ADA and PHRA disability discrimination claims against Defendant. For the purposes of this present motion, Defendant assumes that Ms. Andrews can establish a prima facie case for ADA disability discrimination. (ECF No. 38, at 3). However, Defendant argues that Ms. Andrew's disability discrimination claim fails, because they provided a legitimate nondiscriminatory reason for terminating Ms. Andrews, and she fails to point to any sufficient record evidence to show that Defendant's proffered reason for her termination was pretextual. (*Id.* at 3-7). Specifically, Defendant asserts that Ms. Andrews was terminated, because she removed a binder containing company information from the Butler Office, in culmination with the other written warnings issued to Ms. Andrews. (*Id.*). Ms. Andrews argues that she has produced evidence on the record to establish a genuine issue of material fact that she was terminated because of her disability. (ECF No. 42, at 7-20).

A defendant's burden to articulate a legitimate, non-discriminatory reason is "relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Shellenberger v. Summit Bancorp*, 318 F.3d 183,189 (3d Cir. 2003) (quoting *Krouse*, 126 F.3d at 500) (alterations in original). Defendant alleges that it terminated Ms. Andrews, because she removed "internal, confidential information from the premises – specifically, a variety of instructions, notes and similar information pertaining to the operation of the Butler office." (ECF No. 38, at 4). Ms. McKelvey provided this reasoning within her June 19, 2023 notice of termination to Ms. Andrews. (ECF No. 37-29). Thus, Defendant has provided a legitimate, nondiscriminatory reason. The burden thus shifts to Ms. Andrews to show that this proffered reason for her termination was pretextual.

To demonstrate pretext, Ms. Andrews must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 283 (3d Cir. 2001) (citation omitted). Ms. Andrews must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's justifications to render them "unworthy of credence." *Id.*

As mentioned above, for the purposes of this brief, Defendant assumes that Ms. Andrews can establish a prima facie case for disability discrimination, but she cannot establish that Defendant's proffered legitimate nondiscriminatory reason for terminating

9

Ms. Andrews was pretextual.[1] Defendant's proffered reason for terminating Ms. Andrews is that she removed the binder containing company and patient information from the Butler Office. The June 19, 2023 termination letter provides as such. Ms. Andrews argues that Defendant's overall motivations, shifting explanations, and totality of the circumstances in this case establish pretext. (ECF No. 43, at 20-27). It is undisputed that Ms. Andrews removed the missing binder from the Butler office. What is disputed; however, is whether or not the binder contained company and/or patient information, or whether or not the binder was empty. The actual contents of the binder are not necessarily relevant to the question of whether or not Defendant's reason for Ms. Andrew's termination was pretextual. An employer is permitted to act on a legitimate, nondiscriminatory reason even if it is "wrong or mistaken." *See Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994). Courts must focus "not on what actually happened, but what the employer honestly believed." *Arana v. Temple Univ. Health Sys.*, 776 F. App'x 66 (3d Cir. 2019) (unpublished) (citing *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152-53 (3d Cir. 2017).

The record is clear that Ms. McKelvey had a good faith belief that the binder contained company and/or patient information when she terminated Ms. Andrews. Ms. McKelvey emailed Ms. Andrews on June 16, 2023 and asked if Ms. Andrews knew when she would be returning to work and where the missing binder was located. (ECF No. 46, at 23). On June 18, 2023, Ms. Andrews responded, and confirmed that she had the binder and that she shredded her passwords and that there is nothing that "[she] want[s], need or

---

[1] The only adverse action Ms. Andrews alleges related to her claims for disability discrimination within her First Amended Complaint was her termination. (*See* ECF No. 28, at ¶ 94). As such, the Court will only discuss Ms. Andrew's termination within this section of the opinion.

care to have in [her] possession." (*Id.* at 24). Ms. Andrews even acknowledged in her June 18, 2023 email that, "I do realize that while it was my binder, its contents are property of Hearing Instruments . . ." (*Id.*). In addition, on June 19, 2023, Ms. McKelvey emailed Mr. Grant, Ms. Hoffmann, and Ms. Wolf, asking more about the contents of the binder. (ECF No. 37-28). Ms. Wolfe responded to Ms. McKelvey that she believed there was various documents related to Defendant's business and patients within the binder. (*Id.*).

Given the totality of the information available to her at the time, Ms. McKelvey terminated Ms. Andrews, and told her that the reasons were because Ms. Andrews removed the binder and its purported contents from the Butler Office and that she had been warned two times before about her workplace behavior. (ECF No. 37-29). Ms. McKelvey's inquiry about when Ms. Andrews planned to return to work further underscores that before she knew that Ms. Andrews had taken the binder, she expected Ms. Andrews to eventually return to work. It was only after Ms. Andrews confirmed that she had taken the binder, and after Ms. McKelvey had been informed by the other employees about the binder's purported business and patient records contents that the June 19, 2023 termination letter was issued. Ms. Andrews fails to point to any record evidence sufficient to establish any genuine issue of material fact that Defendant's proffered legitimate nondiscriminatory reasons for her termination were pretextual. As such, Defendant's Motion for Summary Judgment as to Ms. Andrews' ADA and PHRA disability discrimination claims, at Counts I and IV of the First Amended Complaint, will be granted.

### B.  Counts III and VI: Retaliation Claims

Ms. Andrews brings ADA and PHRA retaliation claims against Defendant at Counts III and VI of the First Amended Complaint. Defendant argues that Ms. Andrews fails to establish any genuine issue of material fact that she was retaliated against by Defendant. (ECF No. 38, at 10-13). Ms. Andrews argues that she has established sufficient record evidence that Defendant retaliated against her because of her requests for accommodation and because she indicatied that she would be pursuing a workers' compensation claim for her hand. (ECF No. 43, at 7-20). Specifically, Ms. Andrews argues that the temporal proximity between her protected activities and the adverse actions taken against her supports her retaliation claims. (*Id.*).

The ADA prohibits retaliation against someone who "has opposed any act or practice made unlawful by [the ADA]" or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a).[2] The elements necessary to prove a prima facie case for an ADA retaliation claim are: (1) the plaintiff engaged in protected conduct; (2) the plaintiff suffered an adverse employment action by the defendant; and (3) there is a causal relationship between them. *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004). A causal connection may be shown by "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). If a plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its adverse employment action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-501 (3d Cir. 1997). This burden is relatively light and is satisfied if an employer can "articulate any

---

[2] Retaliation claims under the ADA and PHRA are addressed under the same legal standards and the Court will apply the law as relates to the ADA for all of the retaliation claims in this case. *See Rubano v. Farrell Area School Dist.*, 991 F. Supp. 2d 678, 704 (W.D. Pa. 2014).

legitimate reason" for an adverse employment action. *Id.* The burden then shifts back to the plaintiff to show that the defendant's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. *Id.*

Ms. Andrews alleges that the protected activities she engaged in were her May 30, 2023 email to Ms. Nau inquiring about workers' compensation for Dupuytren Contracture in her hand and her June 13, 2023 email disclosing her back injury. (ECF No. 42, 11-17). Ms. Andrews argues that she was issued the May 30, 2023 and May 31, 2023 written warnings because of her May 30, 2023 email to Ms. Nau. (*Id.*) Ms. Andrews further argues that she was terminated on June 19, 2023 because of her June 13, 2023 email disclosing her back injury. (*Id.*).

Defendant argues that Ms. Andrews' retaliation claims fail for various reasons. As to Ms. Andrew's alleged retaliatory termination on June 19, 2023, Defendant reiterates its argument that Ms. Andrews was terminated for a legitimate nondiscriminatory reason, i.e., her removal of the binder from the Butler Office in culmination with her two other written warnings. Defendant further argues that Ms. Andrews fails to show that said nondiscriminatory reasons were pretextual; and thus, Ms. Andrews cannot establish a genuine issue of material fact that her termination was in retaliation for her June 13, 2023, email. (ECF No. 38, at 10-11). For the same reasons stated above, Ms. Andrews fails to produce any record evidence to show that Defendant's proffered reasons for her termination were pretextual. Thus, Ms. Andrews' ADA retaliation claim, as relates to her June 13, 2023 email, disclosing her back injury, fails.

Turning to the two written warnings at issue, Ms. Andrews claims that both written warnings were issued to her in retaliation for her May 30, 2023 email to Ms. Nau about workers' compensation. First, Defendant argues that Ms. Andrews cannot establish any causal connection between the May 30, 2023 written warning and her May 30, 2023 workers' compensation

inquiry, because the May 30, 2023 written warning was already in process before Ms. Andrews made her workers' compensation inquiry. Defendant cites to *Clark Cnty. Sch. Dist. V. Breeden*, 532 U.S. 268, 272 (2001), which holds, "[e]mployers need not suspend previously planned [adverse actions] upon discovering that [an employee may have engaged in protected conduct], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Ms. Andrews argues that the few hours that passed between her May 30, 2023 workers' compensation inquiry and the May 30, 2023 written warning is enough alone to establish causation. In support of this proposition, Ms. Andrews cites to *Lichtenstein v. UPMC*, 691 F.3d 294, 307 (3d Cir. 2012), where the Third Circuit held that a seven-day gap between protected conduct and termination may be sufficient alone to establish a causal connection.

Ms. Andrews fails to establish a causal connection between her May 30, 2023 email to Ms. Nau and the written warning issued to her on the same day. The record evidence is clear that Ms. McKelvey was the only person with the power to discipline Ms. Andrews. (ECF No. 46, at 3). On May 26, 2023 Mr. Gary sent an email to himself as a reminder to review the complaints he had received about Ms. Andrews with Ms. McKelvey upon her return. It is undisputed that Ms. Nau had previously prepared Ms. Andrews' written warning for Ms. McKelvey's approval upon her return. (*Id.* at 9). May 30, 2023 was Ms. McKelvey's first day back to work. (*Id.* at 10). Mr. Gary's May 26, 2023 email was forwarded to Ms. McKelvey on May 30, 2023, at 7:54 a.m. This email was before Ms. Andrews emailed Ms. Nau. (*Id.* at 9-10). It is clear that disciplinary action was being contemplated before Ms. Andrews' May 30, 2023 inquiry about workers' compensation. Further, there is no record evidence that Ms. McKelvey was aware of Ms. Andrews' inquiry regarding workers' compensation before she issued her May 30, 2023 written

warning to Ms. Andrews. Ms. Andrews does not point to any other evidence, outside of temporal proximity, sufficient to show a causal connection between her May 30, 2023 workers' compensation inquiry and the written warning issued to her on the same day. As such, Ms. Andrews fails to establish a causal connection between the two.

Next, Defendant argues that Ms. Andrews cannot establish a causal connection between her May 30, 2023 email to Ms. Nau and the May 31, 2023 written warning, because Ms. Andrews admitted to the conduct for which she was disciplined. (ECF No. 38, at 12-13). Further, Defendant argues that the conduct she was issued the second written warning for was related to an item directly listed in the written warning she received on May 30, 2023. (*Id.*). Ms. Andrews argues that the one-day separation between her May 30, 2023 workers' compensation inquiry and the second written warning on May 31, 2023 is enough to establish a causal connection. (ECF No. 43, at 15-16).

The May 30, 2023 written warning indicated that Ms. Andrews was not "consistently having Patients complete the front of the Audiogram prior to the appt." (ECF No. 37-14, at 1). The second written warning, issued to Ms. Andrews on May 31, 2023, stated:

> After just sending the warning yesterday, today again you violated the policy. A competitive user came in and *you never had them fill out the required front of the Audiogram*. You only had them complete the HIPAA form and then took the form into Marleen. She had to again tell you to have the Patient complete the required front of the Audiogram so that we had all the Patient information prior to the appointment.
>
> I'm not sure where the confusion is on this. This policy is critical to our business operations (especially with a competitive user) and you continue to ignore it.

(ECF No. 37-19) (emphasis added). It is undisputed that Ms. Andrews did not have the prospective patient fill out the audiogram until after she had asked Ms. Hoffman about the proper procedure. Ms. Andrews confirmed the same in her June 1, 2023 email to Ms. McKelvey

15

wherein Ms. Andrews stated, "I apologize for not remembering the protocol, I am not perfect, but at least I asked and took care of it." (ECF No. 37-20). The record is clear that Ms. Andrews was disciplined for something that she was told she must do just the day before and that she admitted to the conduct. *See, e.g.*, *Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 36-37 (3d Cir. 2017) (upholding dismissal of ADA retaliation claim on summary judgment where the plaintiff "does not dispute the underlying conduct giving rise to [the employer]'s warnings and adverse employment actions.").

Other than temporal proximity, Ms. Andrews does not point to any other record evidence sufficient to establish any genuine issue of material fact that a causal connection existed between her May 30, 2023 workers' compensation inquiry and the second written warning issued to her on May 31, 2023.[3] As such, Defendant's Motion for Summary Judgment, as to Ms. Andrews' retaliation claims at Counts III and VI of the First Amended Complaint, will be granted.

### C. Counts II and V: Failure to Accommodate Claims

Ms. Andrews alleges ADA and PHRA failure to accommodate claims against Defendant at Counts II and V of her First Amended Complaint. Defendant argues that Ms. Andrews never requested any accommodation; and thus, cannot establish any genuine issue of material fact as to these claims. (ECF No. 38, at 8). Ms. Andrews argues that she made requests for accommodations on multiple occasions, and that Defendant failed to address any of them. (ECF No. 43, at 28-31). Specifically, Ms. Andrews argues that after the Butler Office was remodeled

---

[3] Even if Ms. Andrews could establish a causal connection between her May 30, 2023 email to Ms. Nau and the written warnings issued to her on May 30, 2023 and May 31, 2023, the written warnings did not constitute adverse actions. Neither of the warnings effected a material change in Ms. Andrews terms or conditions of her employment. *See Mieczkowski v. York City School Dist.* 414 Fed. Appx. 441, 446-447 (3d Cir. 2011) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) ("reprimands that do not 'effect a material change in the terms or conditions of . . . employment' cannot be considered adverse employment actions.").

in May of 2023 and before her injury on July 13, 2023, she made several accommodation requests indicating that the new filing cabinets installed at the Butler Office aggravated her back. (*Id.*).

Under the ADA, an employer must "mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodations would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices... and other similar accommodations for individuals with disabilities." *Id.* § 12111(9).

To bring a failure to accommodate claim under the ADA, a plaintiff must establish: "(1) she was disabled, and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated." *Capps v. Mondelez Glob.*, LLC, 847 F.3d 144, 157 (3d Cir. 2017). "A request for accommodation does not have to be formal, in writing, or include the magic words 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability." *Hanafy v. Hill Int'l, Inc.*, 669 F. Supp. 3d 419, 436 (E.D. Pa. 2023).

Ms. Andrews argues that from May 2, 2023 until her back injury on June 13, 2023, she asked for several accommodations regarding the new filing cabinets in the Butler Office. In her deposition, Ms. Andrew's testified that she first told Mr. Grant about her issue with the filing cabinets on May 2, 2023. (ECF No. 43, at 28-31). Ms. Andrew's argues that she again complained about the filing cabinets in an email to Mr. Grant and Ms. Simpson on May 16,

17

2023. (*Id.*).[4] Further, Ms. Andrews argues that she complained about the filing cabinets verbally about ten times on unidentified dates. (*Id.*).

There is no evidence that Ms. Andrews told Mr. Grant that the filing cabinets aggravated her back pain on May 2, 2023. When Ms. Andrews was asked about the conversation that she had with Mr. Gary on May 2, 2023, she testified as follows:

> [Gary] brought boxes of filing cabinets and, um – boxes of files. So my job was to put the files into the drawer. And I started to do that. And at one point he walked up to the reception area, and I said "Gary, this isn't all of the file cabinets. Right? These files are not going to fit in here." And he said, "I know. I don't know what happened. Either somebody screwed up or the cabinets went to another office." But he admitted that this in no way was the way it was supposed to be pre seeing patient day, and he was upset that these cabinets were missing.

> And he -- I remember him calling somebody. He was on the phone with corporate and said, "We'll be getting some. We'll be getting some." I said, "Oh, okay," and I said, "what should I do in the meantime, um, not pack these, leave some of these boxes?" Well, that wasn't an option because the patients were coming the next day. So I had to do my best to get all of those files in these drawers.

> And subsequently, if not every day, every other day there was conversation, I had with one with Margie where I said, "Do you believe how heavy these drawers are?" And she goes, "Yeah, these are ridiculous." Um, "Gary said we're getting more." Marleen said, "I'm not opening these. I'm not touching these with my back." And -- and that's when I said, "Well, you know, let me know. Maybe I can open the drawer, you know, work together and save both of our backs here."

> But yeah, Gary, I -- several times. And then weeks went by, you know. And like I said, he was on site a lot because he had a lot of touching up to do. And, um, you know how remodels go, there's still some things to do after the fact. So, he was on site quite a bit and I let him know often because I knew and I said, "This is, this is going to be a problem. I have a bad back. This is hurting. Good thing I'm only here for a few hours." Um, I asked Margie to help because she was -- didn't have a back issue. So I would ask her when I was leaving for the day, "Margie, please, if you could pull any files for coming up appointment days, that would be great." So we all were very aware, as Mr. Grant was, that this was a problem.

---

[4] Ms. Andrews indicates many times in her brief that she emailed Mr. Grant and Ms. Simpson on May 16, 2023, reiterating her concerns with the filing cabinets, citing to Exhibit PP. There is no such email contained in Exhibit PP. The Court will not search through the record for said email as courts are "not required to scour the record to make the case of a party who did nothing." *United States v. Stevenson*, 832 F.3d 412, 421 (3d Cir. 2016) (internal quotations, citations, modifications omitted). The Court will therefore not consider this alleged email in its analysis.

18

(ECF No. 37-1 at 77-79).

The above testimony does not establish any question of material fact that Ms. Andrews told Mr. Grant that the new cabinets would be an issue for her back or that she requested any accommodation on May 2, 2023. Ms. Andrews testified that she asked Mr. Grant if they would get any more filing cabinets because the files would not fit. The only other record evidence supporting that Ms. Andrews requested any sort of accommodation related to the cabinets is her own vague testimony that she had told Mr. Grant about her back hurting because of the cabinets "ten times" and "90 percent of that was verbal" before her injury on July 13, 2023. (ECF No. 37-1, at 84). There is nothing on the record, other than Ms. Andrews' own testimony, referencing requested accommodations for the filing cabinets. Ms. Andrews' self-serving testimony, absent other evidence, is not sufficient to show that she requested any accommodation regarding the filing cabinets.

Further, even if the record could support any question of material fact as to whether or not a request for accommodation related to the cabinets was made, Ms. Andrews' own testimony shows that Mr. Grant was looking for a solution for the filing cabinets. The record evidence is clear Mr. Grant was making a good faith effort to assist Ms. Andrews, by ordering more cabinets. As argued by Defendant, a brief period of six weeks, between an accommodation request and being provided a reasonable accommodation is insufficient alone to show discrimination. *See Hudson v. Guardsmark, LLC*, 2013 WL 6150776, a *11 (M.D. Pa. Nov. 22, 2013) (unpublished). According to Ms. Andrews' testimony, on May 2, 2023, the same day that Ms. Andrews reported her issue with the cabinets, Mr. Grant immediately called to get more cabinet. Ms. Andrews' last day at work was on June 13, 2023 and she was terminated on June 19, 2023. A six-

19

week period between the May 2, 2023 order for more cabinets and Ms. Andrews June 13, 2023 report of her back injury is not enough alone to establish discrimination. Thus, the record does not support a finding or raise any question of material fact that Ms. Andrews requested any accommodation or that Defendant did not make any good faith attempt to assist her.

As such, Defendant's Motion for Summary Judgment, regarding Ms. Andrews' ADA and PHRA failure to accommodate claims, at Counts II and V of the First Amended Complaint, will be granted.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment will be granted as to all claims and counts within the First Amended Complaint. Judgment will be entered in favor of Defendant and against Plaintiff. The clerk shall mark this case as closed. A separate order to follow.

DATE: March 25, 2026

Marilyn J. Horan
United States District Judge